[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION OF THE COURT
Appearances:
For the plaintiff:
 JUDITH ELLENTHAL, ESQUIRE 750 Summer Street Stamford, CT 06901
For the defendant:
 GLENN ALLAN GAZIN, ESQUIRE 75 Burwood Avenue Stamford, CT 06902
THE COURT: The Court finds it has jurisdiction over the marriage. One party has resided in the state of Connecticut continuously for more than one year prior to the bringing of this action. There has been one minor child born to the wife since the date of the marriage and that is Andrew Vincent Wittman who was born on March 28th, 1997. There have been no other minor children born to the wife since the date of the marriage, she is not currently pregnant. The parties are not recipients of public assistance.
The Court finds the marriage between these parties has broken down irretrievably and that there is no reasonable hope of its reconciliation for reasons that may be best described hereinafter.
The Court has carefully considered the statutory criteria for the grant of a dissolution of marriage or a legal separation as requested by one party, issues of custody, parenting access, visitation, child support, alimony, assignment of interest in the marital estate or property settlement, counsel fees, issues attendant to life insurance, health insurance, health expenditures for the minor child and all of the attendant issues that have come up over time as a result of various case law.
At the outset let me note that these parties on April 6th came to court and after a Special Masters' proceeding succeeded in coming into a written stipulation in which they've made an agreement on how to care for the minor child, Andrew. Without going through the details of that CT Page 7657 agreement, in salient part it provides for joint legal custody and physical custody of Andrew with Ms. Krafick as the designated residential parent and a schedule of access as between the two parties defined in the agreement. That agreement was made an order of the Court on a pendente lite basis on April 6th and it's the parties' desire that it be incorporated in these proceedings as a part of the final judgment and it is the intention of the Court to do so.
Much to the credit of both of these people this agreement was entered into and while there have been difficulties between Mr. Wittman and Miss Krafick the trial displayed no significant level of enmity as it has anything to do with the child, Andrew, and the parties both made significant effort to leave Andrew out of these proceedings, much to their credit and to the benefit of Andrew.
This marriage commenced on November 21st, 1987, it is, therefore, a marriage of twelve years and a few months. Mr. Wittman is thirty-nine years old. The parties met in high school, dated on and off for about five years and were engaged for approximately five years prior to their marriage and, therefore, knew each other well.
Mr. Wittman is in good health, he has a high school education, he does not have an advanced degree of any sort. He's got a variety of work experiences which have led him in some way or another down a path to his present employment. His interests were in photography and design. He had a variety of jobs, none of which had any terrible significance in terms of pay but provided him experience in production management capacity and the like until 1987 when he, in the same year of his marriage, became the assistant art director for a company called Catalog Media Corporation earning approximately thirty thousand dollars a year. He stayed there for approximately four years and then went to Wittman Design, his own company, and in which he was there for approximately seven years. These years cannot be absolutely exact because if you do the math it runs in about one year over where it should be and that's why the Court said approximately. At Wittman Design Mr. Wittman earned between forty and fifty thousand dollars a year, he relates. And the problems with it is, it was self-employment and therefore lacked the kind of consistency that a W-2 paycheck might present for a family.
Andrew was born in 1997 and so Mr. Wittman made a decision to go to work for other people. First he worked for CompuCard and in December 1997 became an employee of Priceline.com Incorporated where he is presently employed in the same capacity in which he was hired and that is as creative director. His initial rate of pay was ninety thousand dollars and by agreement was, upon his request several months later, increased to a hundred and twenty-five thousand dollars per year. CT Page 7658
There are no significant benefits at Priceline for him other than a 401K plan and health insurance. However, there is another kind of compensation at Priceline.com and by exhibit the Court finds that the stock options that were granted to Mr. Wittman were in the nature of compensation both for the services offered from his employ on December 1997, to and including into the future as pay as it was indicated as additional compensation for his commitment to Priceline.com.
The commitment, however, by way of stock options additional pay was conditioned upon his staying in the employ of Priceline.com and not being terminated for cause or the like. By the terms of the plan, had Mr. Wittman been terminated from Priceline.com for cause before the stock options, that the Court will discuss hereinafter, vested, he would have lost them all. He was, however, at the same time, an employee without an employment contract. Certainly not one in writing.
His employment income by way of his base pay of a hundred and twenty-five thousand dollars has not increased since he received the hundred and twenty-five thousand dollars. The stock options that he was granted with the date as of June 1, 1998 and a notification by a Ms. O'Brien on July 1, 1998, had vesting dates of an immediacy of thirteen thousand three hundred and thirty-five options on June 1, 1998; thirteen thousand three hundred and thirty-three options on June 1, 1999; and thirteen thousand three hundred and thirty-three options on June 1, 2000.
Priceline.com experienced a split which resulted, in March, 1999, of the split percentage of an additional ten thousand dollars (corrected to shares later on record) in options and those were under the same terms and conditions as the non-qualified option agreement under which the original options were granted to Mr. Wittman.
In September, 1999 eleven thousand one hundred and eleven options were cashed in through Morgan Stanley over a one week period. Strike that. It was done in July of 1999 but it appears to show recipient's receipt in September, 1999 and it was over a one week period of approximately July 21 to July 28 by sale and various composite parts through Morgan Stanley. Taxes have been paid on those sums and after some allotment that was done by agreement by the parties through the court on a pendente lite basis of some of the proceeds, the balance remains held by counsel pending disposition by this Court.
Ms. Krafick is thirty-nine years old, she is in good health other than some allergies which do not appear to impair her ability to earn income but bother her probably. She, at the time of her marriage, was ready to CT Page 7659 embark upon a career that she had been preparing for as a school teacher and did so. She has ten years vested in teaching at New Fairfield and shows an entry level pay through the Retirement Board, it displays an entry level pay at twenty thousand dollars in the academic year of '87/'88. Upon her leaving her employment for purposes of child rearing in 1997 she showed a pay rate of approximately thirty-four thousand five hundred dollars. She has, by her efforts, also made herself a fifth year Master's Degree, which has enhanced, in the teaching profession, her income when she is in employment. The Master's Degree is, obviously, short of a Ph.D. which Miss Krafick now desires when she has the opportunity to do so when Andrew is of sufficient age to pursue so that she may, rather than necessarily teach, work in the educational administration area. Those are her career goals.
Mr. Wittman doesn't express any specific career goals, he remains at Priceline and has, at the present time at least, a demonstrated earning capacity of a hundred and twenty-five thousand dollars. By the Omnibus plan and the option agreement it would appear that there is no promise or contractual right to any further options to look at by way of additional income source from this source of employment.
Counsel urged the Court to see this as a linchpin and a springboard to future employment opportunities and future abilities to acquire income by Mr. Wittman, that would be conjectural. Mr. Wittman has not looked for other work, is staying where he is for the time being and has not been offered any other employment and so, therefore, the Court cannot make the leap to suggest that he is able-bodied, ready and, therefore, will be hired by some other .com, ready to have some kind of a IPO that will assist him to acquire future riches. There's simply no evidence to support that and, therefore, it would be conjectural and the Court cannot do so.
As to Ms. Krafick's future earnings and earning capacity, based upon the evidence the Court can find that her present earning capacity is at or about thirty-four thousand dollars per year but that does not take into consideration, at the present, the advisability of her staying home with Andrew. Andrew is preschool age, obviously, by dint of his birth date in 1997. The evidence is cloudy as to whether or not the parties intended, in March of 1997 or immediately prior thereto, Ms. Krafick to stay home for one year, two years or a bunch more years. However, the economic circumstances of this family has changed since March of 1997 and there are sufficient assets for the Court to ensure that the advisability of Ms. Krafick's desire to stay home, at least until Andrew is in first grade, need not be looked at through the scope of what the parties intended back prior to his birth. At that point in time Mr. Wittman was not in the employ of Priceline.com and had not been granted the options CT Page 7660 which are now part of the marital estate.
The Court notes that the parties purchased a home in April of 1991 which has been sold and the proceeds are being held as referenced hereinafter and that Mr. Wittman has had for sometime indeterminate a piece of property at or about Lake Mead, which no one has undertaken to contest the insignificant value he has assigned to it on his financial affidavit, and so, therefore, in the absence of any contrary evidence the Court will presume that it is not more significant in value.
The focus of this trial has been the cause of the breakdown of the marriage or at least that's been the focus of the lion's share of the evidence that was heard through witnesses. And, while it is one factor, as both of you have heard recently as I read you the statutes, in the issue of the settlement of your property issues and in the issue of alimony it is not the only factor. It would be, however, perhaps inappropriate to make only a very brief finding in regard to it because it would do a disservice to the amount of energy each of the parties felt needed to be placed on this issue. The Court, therefore, continues with the findings in regard to that now.
The Court finds that the plaintiff, Mr. Wittman, had for several years some repressed unhappiness in the marriage and that he did not express it as completely and as fully to Ms. Krafick as perhaps he should have. And, the note that Mr. Wittman wrote the day of the November incident is perhaps indicative of the way he gives messages and, that is, apparently, they are often couched in softening terms and, therefore, perhaps the message was not as clear to Ms. Krafick as it could have been had it been placed in more clear and specific terms.
That Mr. Wittman may have been unhappy for reasons that he can only begin to explain was partially his problem and partially Ms. Krafick's problem. And that's because you're married and when people are married there's a duty to have sensitivity to what the needs of both of you are for nurturance and support and when Mr. Wittman expressed his desire for either more time alone or less time with family or any other kind of anxiety or desire for a change of things, perhaps Ms. Krafick should have listened more closely while he should have expressed himself more explicitly. That in itself is not a cause by either of you for a marriage to fall apart. It is, however, the prelude for everything that occurred after it.
There were marital problems, certainly, in 1998. The fact that you went about the business of planning a family and having a child and even having relations again and having Ms. Krafick become pregnant again doesn't obviate the fact that there were marital problems. The counseling CT Page 7661 that you went through as a family was marital counseling. If Ms. Krafick saw it as counseling only for Mr. Wittman's depression, then she wasn't listening well enough to him.
It was, however, the decision by Mr. Wittman to stop paying the close attention to trying to figure out how to solve these marital problems that created the crisis from which everything else ensued. There is no good timing for starting to pay attention to another woman or man but, if there can be bad timing, Mr. Wittman's was awful. Ms. Krafick was just on the other side of recovering from the loss of the twins, which, while a loss for both parties, is a particularly difficult loss for a woman carrying the children and all the attendant emotional difficulties that come with it. And so while Mr. Wittman was lost in his own unhappiness he was not paying attention and attentive to those problems, emotionally, that can be created and the suffering of Ms. Krafick in those circumstances.
This Court can't determine because it wasn't there whether or not Mr. Wittman was having a physical affair with Ms. Martell in the fall of 1998. It really doesn't matter; what does matter is this. When those flowers were sent they weren't flowers just to another friend. You don't sit down and write a note and rip it up and try again and try again, as Mr. Wittman described, if it's an insignificant friend. The choice to send the flowers was neither idle nor light. The result of that, this Court finds, is that he no longer intended to and invested in attempting to find a way to salvage what was a difficult time in this marriage and for that Mr. Wittman bears fault.
However, the story does not end there, unfortunately. Ms. Krafick's behavior from November 18th forward was equally inappropriate. Her conduct at Priceline on the day of the 19th was outrageous and perhaps what is troubling to the Court is that in Ms. Krafick's testimony she shows no insight today as to the inappropriateness of that conduct and so I will highlight it. First, she risked Mr. Wittman's employment by making accusations about him and another employee in a way that attracted attention from colleagues and supervisors at Priceline. Perhaps more importantly to the Court is, she violated the boundaries and private space of strangers to the circumstances of this family by asking people as they came forward: Are you having an affair with my husband, Brian Wittman? Did you know my husband, Brian Wittman, is having an affair with Jennie Martell? Are you Jennie Martell who is having an affair with my husband? And the like. These were third party individuals who should not have been accosted, who should not have been disrupted by the circumstance that Ms. Krafick found herself in with Mr. Wittman.
And, the Court notes, parenthetically, that at that moment in time Ms. CT Page 7662 Krafick knew nothing about Ms. Martell's role in this whole picture. She knew her husband had sent flowers, she knew or at least thought he had sent a note that had a very personal sentiment. She did not know Ms. Martell's reaction to all of this, whether these things were welcome or not, and so she acted in reckless disregard for that and, more importantly, to the third parties and individuals who had to deal with the circumstance of her distraught behavior.
Going to the house and removing everything that was removed and going to the bank accounts and removing what was tantamount to twelve thousand dollars in the next few days was wrong. This is not the behavior of someone who is acting in a contemplative, cautionary, deliberative manner; it is the behavior, however, of an angry and vindictive person. Ms. Krafick was very, very mad at Mr. Wittman. There is legal process for the protection of assets and income. There are ways to act in relation to each other that do not take on a position that shows reckless disregard for the rights of others.
Now, why is this important? Because it all happened after Ms. Krafick found out that Mr. Wittman was in all likelihood interested in another woman. This is why it's important. The parties have two irreconcilable views on their marriage. Mr. Wittman's view is that Ms. Krafick made sure that she got her way, that her needs were paramount to his and that she had a way of going about and getting her needs taken care of. Her perception is fairly opposite of that and that it was Mr. Wittman's needs that came first and that it was his depression for no obvious circumstance other than working hard that caused the difficulties in the latter years of the marriage.
Given the circumstance of Ms. Krafick's behavior the Court has no choice but to conclude that Mr. Wittman's view is the more credible one and that Ms. Krafick is, in the context of her relationship with Mr. Wittman, a person who took care of her needs and, when wronged, took care of them unilaterally without regard to the circumstances for anyone else and this she bears fault for.
Therefore, weighing the cause of the breakdown of the marriage each party bears fault and neither party can walk away from these circumstances and suggest that they bear no fault for the breakdown of this marriage.
Now, the parties have various assets which I want to go over. The proceeds of the sale of the home are in a bank account being held and the value is fifty-four thousand five hundred and sixty-six dollars. There's nine hundred and eighteen dollar Lake Mead property in Mr. Wittman's name. There's a 1996 Nissan Maxima which presently Mr. Wittman is driving CT Page 7663 that previously Ms. Krafick had driven, which has a gross value, the Court finds, of fourteen thousand dollars and had debt associated with it of approximately one thousand dollars. There is a lease on a Ford Expedition, which, while not an asset, being a liability, is associated with a car that one of the parties drives. The lease appears to be, from the evidence although it was fairly paltry because I didn't have the document in front of me, it would appear it's either in Mr. Wittman's name or he at least bears legal responsibility for it. That's presently the automobile that Ms. Krafick drives, she's particularly concerned about the low mileage in that automobile, that is, how little miles she gets per gallon of gas from the automobile.
Ms. Krafick has jewelry in her possession, there was a list of jewelry put in evidence. Her last financial affidavit discloses a value of four thousand dollars. There are appraisals dating back to 1990 which suggest that three of the pieces have a value as of that date of nine thousand dollars. There is all the rest of the jewelry on that list and based upon the evidence presented before the Court, although the Court believes that the jewelry is significantly higher in value, the Court is constrained to find the value of the jewelry in total to be nine thousand dollars.
There are various household furnishings, as related earlier, currently in the possession of Ms. Krafick, of indeterminate value. The Court has insufficient information to attach a value to them.
Mr. Wittman has furnishings at his present place of residence of indeterminate value. He did, during the time of the marriage, purchase thirty-three shares of Topps stock and it has a present value of three hundred and thirty dollars. His 401K plan as of March 31 showed a value of sixteen thousand one hundred and fifty-three dollars. Presuming that there's been ten weeks of contribution at a hundred and forty-five dollars per week since then the Court finds that value to be approximately seventeen thousand five hundred dollars. He's got his American Century IRA, the Court finds the value at nine thousand seven hundred and thirteen dollars, being constrained to use the March 31 date there being no other evidence before the Court. The same is true for the American Century Gift Trust in his name which the Court accepts the value of five hundred and seventeen dollars. He's got checking of approximately a hundred dollars and a newly set up custodial account for the benefit of Andrew with a value of eight hundred dollars.
Ms. Krafick has approximately fifty, 50, fifty dollars in her bank accounts. She's got a pension which shows a value, from her teacher's work, as of June 30th, 1999 of twenty-eight thousand five hundred and ninety- eight dollars. The sums on her financial affidavit were substantially less, somewhere around twenty thousand dollars. I don't CT Page 7664 know if that was intended to express an after tax amount but, in any case, there's been one year of interest on the twenty-eight thousand five hundred ninety-eight dollars, the Court is in no position to compute the interest. The previous year's interest was computed at 13.5 percent, the Court's not aware of whether that's a fixed amount or reflective of the fact that it was a good year on the market or the like and, therefore, the Court adds no interest to that sum and leaves the balance as a finding of twenty-eight thousand five hundred and ninety-eight dollars. Ms. Krafick's Century Gift is at five hundred and seventeen dollars, just as her husband's.
There is held the net proceeds of the sale of the Priceline stock for which options have been exercised, which are four hundred and seventy-three thousand dollars. There are thirty-eight thousand eight hundred and eighty- nine vested stock options, which vested on the schedule described by the Court previously, which, at the close of business yesterday, by agreement of the parties, is the valuation time, the stock was trading at forty-three and a half dollars per share. The parties have agreed and the court accepts the stipulation to value the options at the value of the stock and that would provide a present value, if my math is correct, of one million six hundred and ninety-one thousand six hundred and seventy-one dollars and fifty cents.
The Court is aware that there is a strike price cost of exercise and taxes attendant to the exercise of any of these options. The Court is also aware that the sale proceeds of the home and the Priceline.com proceeds represent net proceeds, the taxes on them having been paid in the 1999 tax return which is currently in evidence. The taxes on the Priceline.com sales were taxed at ordinary income rates rather than the capital gain rates.
The parties have debt. There is a joint Waterbury Visa Credit Card which, as of December 9th, 1998, had a debt of nine thousand two hundred and eighty-five dollars. Payments have been made in the minimum amount pursuant to the court order by Mr. Wittman, it currently has a debt of nine thousand nine hundred dollars and the Court finds, based on the evidence, that the additional charges were made by Ms. Krafick after December '98.
Mr. Wittman has a post-separation debt to the Cornerstone Bank in the amount of fifty thousand dollars. There is a MBNA credit card which, as of October, 1998, had a debt of four thousand nine hundred and two dollars and Mr. Wittman incurred post-separation debt on that of approximately twelve thousand dollars, which has resulted in the debt now being sixteen thousand nine hundred and fourteen dollars. CT Page 7665
There is a Chase card, it's a joint credit card but Mr. Wittman has incurred post-separation debt to the tune of nine thousand seven hundred and thirty-four dollars, as he also did to his American Express Optima card in the amount of seven thousand eight hundred and twenty dollars.
The Ford Expedition Chase car lease has a balance of approximately four thousand two hundred and fifty dollars and that is without regard to any penalties that there may be for excess mileage and the like under the lease agreement, there being no evidence before the Court in regard to that.
He also owes attorney's fees, Mr. Wittman, in the approximate amount of ten thousand dollars. Ms. Krafick has post-separation debt to her mother in the amount of one thousand seven hundred and ninety-five dollars, to her uncle in the amount of five thousand five hundred twenty-one dollars and forty-four cents. She has cumulative attorneys' fees outstanding to her present and former attorney in the amount of forty thousand four hundred and twenty-six dollars, litigation costs outstanding in the amount of four thousand three hundred dollars. She owes Elizabeth McDonald one thousand forty- five dollars post-separation and has an outstanding indebtedness to SNET in the amount of three hundred thirty-eight dollars and thirty-two cents. She has a Peoples MasterCard which she has charged on post- separation with a debt of approximately two thousand five hundred twenty-six dollars and sixty cents.
The Court received evidence about the desires of Ms. Krafick in terms of ultimately not living in her mother's home, which most adults at some point in their life do want to move out, and she has moved in on what she perceives to be a temporary basis and would rather either rent or, if possible, purchase a home, one perspective in her mind is in the range of two hundred and thirty thousand dollars. It is important that both of these parties not only have reasonable accommodations for themselves but also reasonable accommodations in which Andrew is raised and the Court is aware and mindful of that.
Ms. Krafick has received contribution from her mother, where she resides, on a semi-regular basis, she estimates the contribution at or about a hundred dollars per week. There wasn't sufficient clarity as to whether it really totals that amount each and every week or whether there's a give and take in flux but what is discerned from that is that there is some reliance upon her mother, when there is a shortfall from her child support and alimony order, for additional funds to meet expenses that she incurs on a weekly or monthly basis.
Ms. Krafick is also paying rent in her mother's home at a rent that she believes to be sub-market, measuring it by her inquiries into the market CT Page 7666 and also measuring it by comparable housing that she perceives it would be if she were in housing similar to Mr. Wittman's. The rent is, roughly, I believe it was nine hundred and six dollars per month that she pays to her mother.
The health insurance for the parties is currently maintained by Mr. Wittman through his place of employment and it is not clear at all to the Court what Ms. Krafick's COBRA costs for the same are, there being no evidence to that.
Mr. Wittman has two life insurance policies, both in the amount of a hundred thousand dollars each, which he maintains.
It is, in crafting the orders of this Court, intention of the Court to adhere to the statutory and the case law regarding the same and not to go a process of just mechanically dividing assets in accordance with some specific formula but instead to meet the needs of the parties and a particular concern about the needs of each party to have housing, to meet their debt obligation and to be able to provide for themselves and as parents who have a joint obligation to do so for Andrew in the coming years and presently.
The Court orders the following:
A dissolution of the marriage.
The Court orders the agreement entered into between the parties of April 6th, by way of stipulation, to be incorporated by reference in this judgment and in the judgment file with each of the provisions made a part of this judgment.
The Court did a computation of child support guidelines based upon Mr. Wittman's present earnings only. The Court did not compute in any interest which may be attributable to either of the parties as a result of the asset distribution that you're about to hear, for a variety of circumstances and they are as follows. First of all, as you will find, I'm disgressing into the findings for a minute, I am saddling Mr. Wittman with most of the marital debt. I am providing Ms. Krafick a disproportionate amount of the present dollars. The Priceline options are pretax and, while having a current value, certainly not the bird-in-the-hand that a dollar-in-the-hand is, although they have the value as attached by the Court. And, they don't provide, for instance, interest income that you can go live off of today to pay a bill tomorrow with.
And, the Court is also mindful that Ms. Krafick desires to get CT Page 7667 housing, which may use up some portion, if not all, of the property settlement allotment to her. And, therefore, with the vagaries of all of these things and the Court being unsure as to how the parties will reorder the assets that they're going to own, it was impossible to attribute interest for purposes of computation of child support to either of the parties because the asset which produces the interest may not be utilized by the parties in that way tomorrow or next week.
With that in mind, the Child Support Guideline Worksheet that was submitted today is appropriate and the Court orders guidelines child support to be paid by Mr. Wittman to Ms. Krafick in the amount of two hundred and seventy-two dollars per week. Commencing this year in regard to dependency exemptions and every even year thereafter, in other words, 2000, 2002, 2004, Ms. Krafick shall be entitled to Andrew as a dependency exemption. And, in every odd year, 2001, 2003 and so on, Mr. Wittman shall be entitled to Andrew as a dependency exemption.
The Court orders that Mr. Wittman shall not receive any alimony from Ms. Krafick.
Mr. Wittman shall pay Ms. Krafick periodic alimony in the amount of three hundred dollars per week until the earlier of the following events: September 30th, 2004, either party's death, Ms. Krafick's remarriage or cohabitation as it may be defined and interpreted by statute and case law. This alimony is non-modifiable as to both term and amount. The Court makes it non- modifiable as to amount because of the asset division between the parties, the other statutory criteria and the assuredness of Ms. Krafick's ability to gain employment when she desires and when Andrew has been in school.
The Court orders the following assets to each of the parties. All of the proceeds of the sale of the home, fifty-four thousand five hundred and sixty-six dollars, and if any interest has accrued day-to-day until that sum is turned over to her are the ownership of Ms. Krafick.
The Lake Mead property is owned by Mr. Wittman.
And each of these things are free and clear of any claim of the other party, lest there be any question.
Ms. Krafick shall be the owner of the 1996 Nissan Maxima free and clear of any claim from Mr. Wittman and he shall deliver the car to her within thirty days and the parties shall swap titles and vehicles at that time. Mr. Wittman is solely responsible for the payment of the balance of the debt on that vehicle and is solely responsible for the payment of the debt on the Ford Expedition and shall indemnify and hold Ms. Krafick CT Page 7668 harmless regarding the same.
All of the jewelry in the possession of Ms. Krafick is hers, free of any claim of Mr. Wittman.
The household furnishings that Ms. Krafick has now shall belong to her free and clear of any claim of Mr. Wittman except for the Court does order that she shall deliver to him or have available for him at her home the Canon Camcorder; one of the two bicycles, she picks which; the train watches, both of them given to him by his father; the chainsaw; the Soundec turntable and rack; the Mission speakers; the Sharper Image baseball hoop; the Lionel train set; the TV she doesn't want, one of the two televisions; the David Lawrence bench; the antique cigar poster; the sunflower painting; and the Ethan Allen rug; the watercolor and pen painting of Paris of the Eiffel Tower; Nike's dog documents; the Boyd Bear collection; his Apollo 11 T-shirt; and if she has them, his Charlie Brown mug and Peanuts print pillowcase; and the original Topps stock certificates. All of this shall be accomplished within thirty days and the child Andrew shall not be present during that period of time.
Ms. Krafick shall deliver to Mr. Wittman all of the family videos and photos, pictures and negatives, and videos including the video in the camcorder, and Mr. Wittman shall, in his discretion, make two lists of those particular items and Ms. Krafick shall pick one of the lists for her to have those items or, in his discretion, he may take all of those pictures and videos and make copies and the parties shall split the cost of the copies so that each has a set of copies. This is to include all memorabilia, pictures of Andrew whether it's from the hospital, Santa Claus or the like.
Mr. Wittman is the sole owner of the property in his respective home. He shall be the sole owner of the thirty-three shares of Topps, his 401K, his American Century IRA, and his American Century Gift.
Ms. Krafick shall be the sole owner of her bank account, the checking and savings, and he shall be the sole owner of his bank account, checking and savings.
Mr. Wittman shall be the custodian of the custodial account that he set up for Andrew and Ms. Krafick shall be the custodian of the custodial account that she holds for Andrew, which the Court declined to mention previously.
Ms. Krafick shall be the sole owner of her pension from her State of Connecticut Teacher's Pension, free and clear of any claim of Mr. Wittman, and the sole owner of her Century Gift Trust. CT Page 7669
Of the four hundred and seventy-three thousand dollars in Priceline.com proceeds net, Ms. Krafick shall be the sole owner of two hundred and seventy-three thousand dollars and Mr. Wittman shall be the sole owner of two hundred thousand dollars. If it accrues interest between now and then, do the percentage calculation on ratio and share the additional dollars in accordance with that. These assets are to be disseminated within thirty days of today's date.
Now, the Priceline vested stock options of thirty- eight thousand eight hundred and eighty-nine dollars that vested in accordance with the vesting schedule provided for by the option agreement, it would appear from the documentation that in all likelihood it is impossible for Mr. Wittman to assign by title his interest in these options as a result of these Court orders. There appear to be very narrow circumstances in which title can actually transfer but the Court is going to presume it is an impossibility. If counsel were to discern that the reading of the documents suggest that he can request transfer of title and, if it is going to be allowed, it's certainly subject to the managers of the plan, then he shall do so and if they turn it down there is no recourse for either party. The following orders in regard to ownership of the stock options suggest that he will not be able to do so, if he can, the number of options shall be transferred title ownership. If not, then he shall do as I tell him to do now.
The Court orders that Ms. Krafick shall be the sole owner of twelve thousand two hundred vested stock option shares in Priceline.com, free of any claim from Mr. Wittman, and he shall be the sole owner of the balance of them, free and clear of any claim of Ms. Krafick.
Now, assuming that he cannot transfer title ownership, upon request in writing by Ms. Krafick for the exercise of those options assigned to her title ownership here, he shall immediately undertake to exercise those options for her. However, all of the costs of exercise of options, strike price, broker's commission, and all attendant costs, as well as all the taxes attendant to both the exercise of the option and the sale of the stock shall be Ms. Krafick's. If she fails to forward those sums to Mr. Wittman he may direct the broker to take those sums from the sale proceeds. If the broker declines to take those sums from the sale proceeds and Ms. Krafick has not forwarded the payment of those sums, he may net out those sums because, otherwise, those costs, taxes, and prices will be assigned to him because the stock options are still in his name and it's to protect him from that.
In any case, under all circumstances, Ms. Krafick shall indemnify and hold Mr. Wittman harmless from all costs, taxes and attendant fees CT Page 7670 related to her request to him that he exercise the stock options and/or sell the stock that has been assigned to her today in the amount of twelve thousand two hundred shares by way of options.
Mr. Wittman shall be solely responsible for the payment of the Waterbury Visa in full and shall indemnify and hold Ms. Krafick harmless regarding it. He shall be solely responsible for the Ford Expedition lease, the Nissan Maxima debt, and the MBNA debt and he shall indemnify and hold her harmless regarding it. He shall be solely responsible for the Chase debt and indemnify and hold her harmless regarding it.
The balance of the debts appear to each have been incurred by the parties in their own names. In any case, they are each responsible for the balance of the debts shown on their respective financial affidavits and shall indemnify and hold each harmless regarding the same.
Mr. Wittman shall maintain health insurance for the benefit of Andrew throughout the period of his minority and shall pay one-half of non-covered expenditures of Andrew; that is, health expenditures that are not paid by insurance whether they be by deductible, co-payment, or simply not covered. For any expenditure over one hundred dollars neither party shall incur such health expenditure for Andrew, unless it is on an emergency basis, without consulting and agreement of both parties. Neither party shall unreasonably withhold their consent. And these provisions of payment are for all reasonable and necessary health expenditures. Health expenditures is to be broadly construed to include hospitalization, medical, dental, orthodontic, eye doctor, glasses, contact lenses, psychological or other mental health treatment that may occur as the child grows up, and the like.
Mr. Wittman has two life insurance policies, it would appear from his financial affidavit that the premiums are reasonable, and because he has them and there's been no evidence that the policies are in danger of cancellation, the Court finds he is insurable for them and so, therefore, pursuant to the law of Lake and Lake the Court orders that Mr. Wittman shall maintain two hundred thousand dollars in life insurance for the benefit of the minor child, Andrew, during the period of Andrew's minority.
Each party shall pay their own attorney's fees. The Court is under the understanding that the minor child's attorney's fees have been paid as represented by counsel at the commencement of these proceedings and, therefore, no orders enter regarding that.
Finally, there is a compact disc collection. The Court is assuming that the compact discs are in both parties' control, that each party has some CT Page 7671 of them, perhaps Ms. Krafick has them all from whence the furnishings were moved, it's not clear. However, each party is to list the compact discs in their respective control that were acquired prior to the separation. And then the two lists are to be given to Ms. Krafick, from these two lists she is to make two lists, an A list and a B list, and then Mr. Wittman gets to pick which one he wants, the A list or the B list. This is all to be accomplished within thirty days.
The Court has no other orders.
Mr. Wittman is plaintiff, Atty. Ellenthal, you think I missed anything?
ATTY. ELLENTHAL: Your Honor, at the beginning of your memorandum you mentioned ten thousand dollars in options, I believe you meant ten thousand options, not dollars.
THE COURT: Ten thousand options in terms of shares of stock, you're right, and to the extent it needs to be corrected, thank you, it is corrected.
ATTY. ELLENTHAL: And then I had, I don't know, there were so many individual items but I don't think you mentioned the U.S. Savings Bonds that were in Ms. Krafick's —
THE COURT: No, I did not. Thank you. I have a habit of — that's because they weren't on the financials but there was evidence and you're right about it.
This is what should happen to the bonds, they were all for the benefit of Andrew. Ms. Krafick, make a copy of all of the bonds, provide a copy of the bonds to Mr. Wittman. Those in which he's the signatory and going to have to sign off for their cashing, give to him. Those in which you are the signatory and going to have to sign off in the cashing, you retain. The bonds are for the benefit of Andrew and should be held that way. These parties are joint custodians and should sit down and discuss whether it is a better investment to hold them, to cash them and put them in their custodial accounts, or the like. They are Andrew's funds, however, and that's all I'll order in regard to them. Thank you.
ATTY. ELLENTHAL: Thank you. There was one other thing, I don't know. I didn't hear you mention an Ethan Allen rug.
THE COURT: I gave it to him.
ATTY. ELLENTHAL: Okay. Thank you, Your Honor, I have nothing else. CT Page 7672
THE COURT: Mr. Gazin, you think I missed anything?
ATTY. GAZIN: No comments, Your Honor.
THE COURT: Well, that wasn't the question. I'm glad you don't have any comments but —
ATTY. GAZIN: No, I didn't notice. I noted nothing.
THE COURT: Thank you.
ATTY. GAZIN: Yes, Your Honor.
THE COURT: All right. Mr. Wittman, you're the plaintiff so I address you first, sir, do you understand these orders?
THE PLAINTIFF: Yes, I do.
THE COURT: All right. Ms. Krafick, do you understand these orders, ma'am?
THE DEFENDANT: Not entirely, no.
THE COURT: Do you have a specific —
THE DEFENDANT: It was lot —
THE COURT: — question?
THE DEFENDANT: It was a lot of information.
THE COURT: It sure was.
THE DEFENDANT: But I will, you know, I will understand them.
THE COURT: All right. Do you have any specific question you want to address or do you —
THE DEFENDANT: Just, when you had talked at length about the pictures, we're going to each have a set of pictures? Is that what you said? Like, he'll have —
THE COURT: I'm giving your husband the choice of simply dividing them in half with you so that you each have a bunch of them or taking the effort to go to a service, copying them all, and then you divide the cost of the copying so you each have a complete set. But, if you re going to CT Page 7673 divide them between the two of you, you divide them amicably together. If you don't think you can accomplish that or you don't each want a half set, then Mr. Wittman can decide to take the burden of getting them copied. Okay?
THE DEFENDANT: Okay.
THE COURT: Thank you.
Anything else?
ATTY. ELLENTHAL: I just wanted to thank the Court for its time in hearing this case.
THE COURT: You're welcome. That's what we're here for.
Folks, go about your lives at this point and the hard work and maybe gratifying work of raising Andrew. Thank you.
We'll adjourn.